MICHAEL L. HINCKLEY, State Bar No. 161645
STIGLICH & HINCKLEY, LLP
149 Natoma Street, Ste 300
San Francisco, California 94105
Telephone:    (415) 865-2539
Facsimile:     (415) 865-2538

Attorneys for Defendant
VICENTE FRANCO ESCALERA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | Case No. CR 09-0103- CRB |
|---|---|
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM AND MOTION FOR VARIANCE** |
| vs. | |
| FRANCO VICENTE ESCALERA, | Date:    July  14, 2010 |
| Defendants. | Time:    2:15 p.m.<br>Dept:    Hon. CHARLES R. BREYER |

I.   **INTRODUCTION**

Franco Vicente Escalera ("Escalera" or "Mr. Escalera") has entered an open plea of guilty to Court One and Count Sixteen of the Indictment in this case.  Count One charges Mr. Escalera with Conspiracy to Possess with Intent to Distribute Heroin and Methamphetamine, in violation of 21 U.S.C. §§ 846.  Count Sixteen charges Possession with Intent to Distribute 50 Grams or more of Methamphetamine, a violation of 21 U.S.C. § 841.

There is a tragic element to this case.  There is no doubt that Mr. Escalera made poor choices here – a fact that he freely acknowledges.  He participated in the narcotics transactions alleged by the government and has pleaded guilty to this Court and accepted responsibility for his actions.  However, as demonstrated more fully below, Mr. Escalera's poor choices came in an environment of abrupt and

complete financial setback that left him reeling, desperate and fearful for the wellbeing and security of his family. The setbacks came after Mr. Escalera spent most of his life engaging in honest hard work to pull himself out of poverty, and providing his family financial stability and support.

The financial pressure on Mr. Escalera was compounded by the fact that his wife has for several years suffered from a deep depression that has rendered her unable to work and to assist financially. As his economic situation worsened he lived in anxiety that he was going to literally lose the roof over his family's heads.

It goes without saying that the conduct at issue in this case was wrong. However, the letters from friends and family filed as exhibits to this memorandum provide an insight into the character of Mr. Escalera beyond the charges and facts of this case. Those letters, those relationships, reveal a man who worked hard from childhood, loved his family deeply, and constantly tried to improve himself as a person, husband and father. Mr. Escalera submits this sentencing memorandum and the accompanying exhibits for the Court's consideration.

II.     **Statement re Sentencing Guideline Calculations**

As set forth in the Presentence Report, this conviction carries a Base Offense Level at 38. There is a 3 level decrease for acceptance of responsibility, and a 2 level decrease for Safety Valve. Thus, the total adjusted offense level is 33. Mr. Escalera is a Criminal History Category I.

An offense level 33, with a Category I Criminal History results in a sentencing guideline range of 135 to 168 months of imprisonment. While parties agree on the applicable guideline calculations, probation is recommending a high-end168 month sentence. For the reasons stated herein, the defense disagrees with this recommendation and moves the Court for a five level downward variance pursuant to 18 U.S.C. §3553.

### III. Statement of Relevant Law

As the Court is aware, in *United States v. Booker*, 125 S.Ct. 738 (2005), the Supreme Court held that the mandatory nature of the federal sentencing guidelines is "incompatible" with the court's Sixth Amendment holding, and that 18 U.S.C.§3553(b) must be severed from the remainder of the act and excised. Id. at 756-57. This remedy, in the majority's words, makes the sentencing guidelines "effectively advisory" in all cases. Id.

The result is that district courts must now impose a sentence, after consideration of the advisory guidelines, that is "sufficient but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. §3553(a)(2):

(a)  retribution (to reflect seriousness of the offense, to promote respect for the law, and to provide "just punishment");

(b)  deterrence;

(c)  incapacitation ("to protect the public from further crimes"); and

(d)  rehabilitation ("to provide the defendant with needed education or vocational training, medical care, or other correctional treatment in the most effective manner").

(See *United States v. Carty*, 520 F.3d 984, 991 (9th Cir 2008)).

In determining the sentence minimally sufficient to comply with the aforementioned purposes of sentencing the court must consider several factors listed in Section 3553(a). These factors are:

(1)  "the nature and circumstances of the offense and history and characteristics of the defendant;"

(2)  "the kinds of sentences available;"

(3)  the guidelines and policy statements issued by the Sentencing Commission, including the (now non-mandatory) guideline range;

(4)  the need to avoid unwarranted sentencing disparity; and

(5)  the need to provide restitution where applicable.

3

DEFENDANT ESCALERA'S SENTENCING MEMORANDUM

18 U.S.C. §3553(a)(1), a(3),(a)(5)-(7).

Application of the §3553(a) factors and (adherence to the §3553(a)(2) purposes) to the unique facts of this case, as set forth in detail below, indicate that the sentencing variance requested is appropriate and warranted.

### IV.     Statement re Relevant 3553 Facts

Franco Vicente Escalera came to the United States at the age of seventeen with little more than hopes for finding a better life. He had grown up in Mexico as part of a large family, but the poverty was nearly unbearable. In the United States he found legitimate economic opportunities that did not exist for him in Mexico, and he quickly began working hard to take advantage of those opportunities. In due time Mr. Escalera was able learn valuable skills necessary to earn a living, establish a lasting and loving relationship with his wife, and raise devoted children.

Mr. Escalera's life in the United States has been far from smooth sailing, however. Exposed to alcohol in a serious way when he was still in elementary school, he developed an alcohol dependency that impaired his judgment many times in his early adulthood. Mr. Escalera's problems with alcohol resulted in convictions for Driving Under the Influence, and a domestic violence conviction that he has never stopped regretting. Eventually Mr. Escalera confronted his alcoholism and gave up alcohol for good. See Exhibit A.

**A. Childhood**

Mr. Escalera was born on July 13, 1961 in Michoacán, Mexico. His father, Pedro Franco, and his mother Petra Escalera, live in Tijuana, Mexico. His mother is 73 years old, while his father is 74. Mr. Escalera has three older sisters, one younger sister, and four younger brothers. He also has a brother who died in early childhood. At this time, most of Mr. Escalera's siblings live in California, although two live in Mexico.

4

DEFENDANT ESCALERA'S SENTENCING MEMORANDUM                C:\Documents and Settings\Lidia\Desktop\Escalera sn memo.doc

Mr. Escalera's family lived in extreme poverty. His father earned a meager living working in the agricultural fields. Very few other economic opportunities existed. As the oldest boy, Mr. Escalera was expected to help the family financially as soon as he could. Mr. Escalera began working in the fields with his father at the age of eight. By the time he reached the age of eleven he had dropped out of school and was working full time.

It was during this period that Mr. Escalera was first exposed to alcohol. After a hard day of work the farm hands would spend time winding down and drinking with each other. Mr. Escalera was expected to drink despite the fact that he was a small boy at the time. As seen below, eventually this early and unusual exposure to alcohol may have contributed to years of struggle with alcohol abuse.

In his early teenage years Mr. Escalera left home and moved to Mexico City in pursuit of greater economic opportunities. He found work in a mattress factory and developed skills as a furniture salesman. Still, Mr. Escalera found limited opportunities. At the age of seventeen he came to the United States hoping to build a life away from poverty.

### B.    Adulthood & Family Life

Upon coming to the United States, Mr. Escalera lived with his aunt in Richmond, California. He found work doing odd jobs until he settled into carpentry work. At the age of 23 he met Veronica Olivarez. The two began a relationship and had two children together – Joanna Franco (24) and Jennifer Franco (20). However, the relationship ended shortly before the birth of their second daughter. Despite the early demise of his relationship with Veronica, Mr. Escalera has always maintained a loving bond with Joanna and Jennifer.

In 1989, at the age of 28, Mr. Escalera met Margarita Chavez Madrigal. He and Ms. Madrigal soon began a romantic relationship that resulted in marriage in 1990. The marriage between Mr. Escalera and Ms. Madrigal has produced two children – Elizabeth (19) and Juan Carlos (15).

The family has been dealt some difficult cards that at times tested and strengthened the family bonds. Ms. Madrigal has struggled with mental health issues for a number of years. She has been diagnosed with bi-polar disorder and serious depression. Her depression became worse when she injured her back at work in the year 2000. Despite surgery, she has been unable to return to work since the initial injury.

Ms. Madrigal's mental health issues have also made it more difficult for her to assist in the raising of the children. The youngest, Juan Carlos, is developmentally disabled, and has struggled with major asthma for most of his life. He is enrolled in special education classes, which has been of great benefit. Mr. Escalera has devoted a great deal of time helping Juan Carlos cope with any perceived differences, and making sure that he understands that he is loved and valued.

Mr. Escalera's devotion to his family is probably best expressed by the letters provided by those who know him. Below is a sampling of the esteem in which he is held, conveyed in the letters (attached hereto as Exhibit B)[1]:

**Letter from Elizabeth Franco, daughter (age 19):**

"My dad is an amazing person. I am not saying this because he is my dad, but because he is….I need my dad so much because sometimes I feel like I can't do this anymore."

**Letter from Juan Carlos Franco, son (age 15):**

"The reason I would like to have my dad with me is because he was a great husband to my mom and a very good father to me and my sister…. I love my dad all my heart…."

**Letter from Jose Garcia, brother-in-law**:

"I have known Vicente for about eight years, as I am married to his youngest sister Marlene. He has been a good friend. He is always been a hard worker and a good caretaker to his family. He has always been there for his wife Margarita, who has had mental illness – depression. Has

---

[1] The letters that were written in Spanish have been translated into English by court certified interpreter Carole Glasser. In the exhibit package, the English translated letter is followed by the original Spanish letter.

taken time off work or left his jobs to care for his wife. He has always been there for his wife. His kids, 19 year old Lisa and 15 year old Carlos have been a great part of his life. He would always take time to help do homework with Lisa and spend a large amount of time with Carlos who has special needs classes. He would take them out and spend evenings being a good father. Vicente has always taken care of his parents Pedro Franco and Petra Franco from a young age. He has tried to work and care for their financial needs as his father has health problems and mother is diabetic…. To me personally, Vicente has always been a good man and is the godfather of my youngest son."

**Letter from Joanne Helvig, Esq., (Margarita's worker's compensation attorney):**

"I am the workers compensation attorney for Vicente Franco's disabled wife, Margarita Franco. I personally witnessed Mr. Franco interacting with his wife and children on numerous occasions…. I have always regarded Mr. Franco as a very kind and caring individual. Mr. Franco also worked long hours as a truck driver in addition to his duties as a caregiver, husband and father. In sum, Mr. Franco has presented himself to me and my staff as a caring and loving husband and father in the face of his father's disabling injury. Mr. Franco has endured an incredible amount of stress due to the fact that his wife was disabled from the open labor market and often needs to be hospitalized. In addition, Mr. Franco clearly is a loving father to his children. As the sole breadwinner of the family, Mr. Franco worked a steady job for many years and was a productive member of society."

**Letter from Amanda Franco, sister:**

"I want to tell you that my brother is the fourth of 10 siblings. He is the oldest male, after three sisters. He was not able to go to school because he had to help my father work in the field. He has always been the pride of the family. He made this mistake. He has been in the U.S. for many years and has always had a good record. Please, I am appealing to your good heart."

### C. Alcohol and Recovery

One of the most severe challenges faced by Mr. Escalera has been his addiction to alcohol. As noted above, Mr. Escalera's exposure to alcohol began at a very early age. Before he was even a teenager he was winding down with alcohol after working exhaustive days in the agricultural fields. The alcohol remained a constant in his life, and as he entered adulthood it became clear that it was a problem. The problems manifested in alcohol related misdemeanor convictions (DUI, Driving with a Suspended License, Drunk in Public), and a misdemeanor domestic violence incident and conviction that haunts him to this day.

It was after the domestic violence conviction, which was fueled by alcohol, that Mr. Escalera seriously dealt with the scope and seriousness of his problem with alcohol. [PSR para. 69]. He hit bottom, he knew it, and he stopped drinking and has not had a drink of alcohol since.

Mr. Escalera's dedication to his recovery from alcoholism did not falter even as he was forced to deal with major difficulties such as his wife's deepening depression and his son's developmental disabilities. Indeed, even while he has been in custody during the pendency of this case he has attended to his recovery. He has participated in the Deuce substance abuse treatment program which is an in custody program offered by Alameda County Sheriff's Department. He has also participated in anger management programs offered to Alameda County inmates. Attached as Exhibit C are certificates certifying completion of the in-custody substance abuse and anger management programs. Also attached are documents notifying the Court of his participation in the programs and a note from his teacher acknowledging that he has been an asset to the class.

### D. Work History & Personal Economic Crisis

There is really no question that Mr. Escalera has been a hard worker for all of his life. As a child he developed an appreciation for hard work that has stuck with him throughout adulthood. When he came to the United States as a teenager, he looked to earn a living and establish himself economically. In 1990 he received his immigration green card which made it easier for him to find work and earn a living. After earning his green card, Mr. Escalera found work in the field of carpentry and developed skills there. He was a carpenter for many years before changing fields and becoming a truck driver in approximately 2001. Mr. Escalera worked steadily as an independent truck driver for seven years and found that the field provided both financial security and personal satisfaction. Because of his hard work, he was able to begin to achieve a bit of the American dream. He purchased a home in San Joaquin County and provided his family a solidly middle class lifestyle.

Mr. Escalera's work ethic was necessary. Because of his wife's injuries and mental illness she has been unable to work for approximately ten years. Since that time Mr. Escalera

has had sole financial responsibility for the family.  It was that sole responsibility that caused panic and desperation when the economy turned sour.

When the recession hit, Mr. Escalera's work began to dry up.  The decline was initially slow, but soon he found it difficult to find meaningful work.  As the work slowed, the bills piled up.  Soon he found himself falling farther and farther behind on his mortgage and other payments. Eventually, Mr. Escalera simply was unable to make a living as a truck driver as the work simply stopped.  He had no idea how he was going to be able to hold onto his house or his marriage.  It was during this financial crisis that Mr. Escalera made the regrettable decision to assist his cousin in the narcotics transactions at issue in this case in order to supplement his income.  (See Exhibit A).

Notwithstanding Mr. Escalera's desperate efforts, in 2008 his financial roof collapsed.  His house was lost to foreclosure and he also filed for Bankruptcy pursuant to Chapter 7.

**V.     Objections to PSR Recommendation**

The Probation Office recommends the Court impose a high-end guideline sentence of 168 months. It bases this recommendation on several factors, the most notable of which will be addressed in turn.

First, Probation takes the position that since Mr. Escalera and his cousin are accountable under the guidelines for a similar amount of drugs Mr. Escalera should receive a similarly high level sentence.  The opposite is true.

Mr. Escalera's sentence is based on the quantity of *his cousin's* drug transactions.  Mr. Escalera's cousin had built and operated a narcotics organization for several years – a fact which he admitted in his plea.  In this case, it is not disputed that the transactions at issue were the transactions of Mr. Escalera's cousin.  The transactions involved his cousin's contacts, his cousin's business, his cousin's money, his cousin's drugs, his cousin's quantities and his cousin's profits.  Mr. Escalera's role was as a helper, as role he held for months, not years.

Indeed, while Mr. Escalera's career has been as a trucker, his cousin has been a career drug offender.  Mr. Escalera made a regrettable choice during a time of personal and financial despair to work for his cousin to make some money when his truck driving work dried up and his family was on the verge of

9

financial collapse. His cousin, on the other hand, has spent his adult life making a living in the narcotics trade simply to make as much money as he could. In sum, Mr. Escalera and his cousin are not similar and their culpability for the quantity of drugs should not be viewed as similar.

Probation also bases its recommended sentence on misconduct committed by Mr. Escalera several years ago. In fact, as stated *supra*, the misconduct was directly related to his drinking -- which stopped with his last drink well over a decade ago. Notably, Probation also cites to a 16 year old arrest which resulted in an almost immediate dismissal by prosecutors. The arrest was based on an accusation by Mr. Escalera's neighbors regarding an alleged confrontation involving Mr. Escalera and the neighbors. Mr. Escalera disputed the allegations then and disputes them now. While the accusation did result in Mr. Escalera being arrested, the case was quickly, and appropriately, dismissed by the District Attorney prior to any substantive appearance. In other words, the incident is a disputed, unproven accusation by disgruntled neighbors of unknown veracity which the District Attorney decided 16 years ago was not appropriate for prosecution, let alone punishment. It should not be considered in determining the appropriate sentence here.

**VI.     A Five Level Downward Adjustment is Warranted.**

As noted above, in fashioning a sentence the Court considers factors such as "the nature and circumstances of the offense and history and characteristics of the defendant." (See 18 U.S.C. §3553(a)(1)). The attached letters and statements from those who know him best attest to Mr. Escalera's generally decent history and personal characteristics. As demonstrated above, the offense circumstances are that Mr. Escalera participated as a helper in his cousin's narcotic transactions. All of these factors strongly mitigate toward the requested adjustment.

Here, the adjustment is further necessary to "avoid unwarranted sentencing disparity" between Mr. Escalera and previously sentenced co-defendants. (See 18 U.S.C. §3553(a)(6)). Specifically, the Court determined that the appropriate offense level for co-defendant Josefina Rodriguez to be 29, with a corresponding guideline range of 87 months to 108 months. As stated in the Pre-Sentence Report, Ms. Rodriguez had been romantically involved with Mr. Escalera's

cousin for approximately ten years prior to the arrest in this case. (See PSR ¶ 17). By the time that the government began its investigation in the Fall of 2007, it was clear that she was involved in nearly every facet of Mr. Escalera's cousin's drug operation. Her work was unquestionably critical to the day to day operation and success of the drug business. She maintained heroin, methamphetamine and cash at her house – which was used as a stash house for the organization. On April 6, 2008, she was stopped by law enforcement officials while driving to Mexico and $353,877 in drug proceeds was seized from her car. (PSR ¶ 24). On February 4, 2009, Ms. Rodriguez was arrested with Mr. Escalera's cousin at her residence where government agents discovered $37,830. Beyond that, Ms. Rodriguez was the individual who delivered the narcotics to Mr. Escalera in the transaction outlined in Count 16.

While Mr. Escalera's cousin and Ms. Rodriguez were spending the decade before this investigation building their drug operations, Mr. Escalera was building his career as an independent truck driver. While Mr. Escalera did eventually involve himself in their operations, he is by all accounts clearly far less culpable than Ms. Rodriguez. Accordingly, Mr. Escalera's requested downward adjustment to one level below the level applied to Ms. Rodriguez is appropriate.

As stated above, such a downward adjustment would not only achieve the section 3553(a) objectives, but would also result in a sentence "sufficient but not greater than necessary" to achieve the purposes of sentencing identified by Congress.

///

///

///

## VII. Conclusion

For the foregoing reasons, Mr. Escalera requests a five level downward adjustment to Offense Level 28, with a corresponding sentence of 78 months, which reflects the low end of the applicable guideline range.

Dated: July 7, 2010

                                          Respectfully submitted,

                                          STIGLICH & HINCKLEY LLP

                                              /s/Michael L. Hinckley

                                        By _____

                                              MICHAEL L. HINCKLEY